No. 41,925

STATE OF KANSAS, *Appellee,* v. HARRY H. COFER, *Appellant.*

(353 P. 2d 795)

Opinion filed July 2, 1960.

*Eugene C. Riling,* of Lawrence, argued the cause and was on the brief for the appellant.

*James W. Paddock,* Assistant County Attorney, argued the cause, and *John Anderson, Jr.,* Attorney General, and *Wesley M. Norwood,* County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRICE, J.: The defendant was charged with and convicted of the offense of statutory rape (G. S. 1949, 21-424) and the offense of incest (G. S. 1949, 21-906). His motion for a new trial being overruled, he has appealed.

The complaining witness is his daughter Julia Ann, who was sixteen years of age at the time of the alleged offenses.

At the outset it should be stated that after a careful examination and study of the record we are convinced that prejudicial error

occurred during the trial, thus requiring a reversal of the judgment and the granting of a new trial.

In order to show the basis of our decision it will be necessary to summarize in some detail the evidence presented.

JULIA ANN COFER (the complaining witness)—

She was born on July 14, 1942, and lived with her parents, two sisters and one brother at 1124 Delaware Street in Lawrence. On June 6, 1959, she and her father (the defendant) were due to appear at the office of the juvenile court at the courthouse in Lawrence, at 8:30 a. m. At 7:30 that morning she and defendant left home in defendant's 1949 model Chevrolet car and drove to a point fourteen miles west and one mile north of Lawrence, at which place defendant had sexual relations with her for approximately thirty minutes. Following this they drove back to Lawrence and arrived at the courthouse between 8:15 and 8:30 a. m. Both going and coming defendant drove his car at a speed of twenty-five to forty miles per hour. She and defendant had had previous sexual relations, usually at home or on occasions when he was driving her to school. One of the instances was when he was giving her a bath, about a year prior to the morning in question. She had told other people that she had been having sexual relations with defendant since she was nine years old. As a result of what took place on the morning in question she was completely "upset." She hated defendant and accused him of always "picking" on her. She had a number of "boy friends," but denied having had sexual relations with them. Several letters written by her to "boy friends" were refused admission in evidence. She stated one of these had been written by her (but not mailed) on the morning in question before she and defendant started out in his car. She and defendant had had trouble around the home over such matters as the doing of housework and her keeping late hours when out with boys. She admitted that she did not know the meaning of an oath in connection with her testimony.

DALE CHAPPELL—

This witness was the sheriff of Douglas county. About a week prior to the trial, which was in the latter part of November, 1959, he and the county attorney drove Julia Ann west of Lawrence so as to have her point out the location of the alleged offenses. To them she identified the spot and it was six miles west of Lawrence and a little less than one mile north.

DR. RICHARD HERMES—

This witness, whose professional qualifications were admitted, made a physical examination of Julia Ann on June 12, 1959, at the request of the probate court and a minister. He took a complete history of her baby illnesses, family record, her menstrual history, and testified that a pelvic examination showed a nonvirginal introitus, and that she was capable of having sexual relations. He found no evidence of pregnancy. He further testified that in his opinion Julia Ann was quite intelligent, rather timid and retiring, and was sufficiently emotionally upset to be in need of psychiatric treatment. Further, that a child who has had sexual relations with her father would necessarily be possessed of a "guilt complex," that her entire outlook on life would be fatally altered by such relationship, and that her grades in school and her social conduct would be affected.

BERNARD WHALEN—

This witness was a probation officer of the juvenile court and first became acquainted with the Cofer family when defendant came to the juvenile court and complained that Julia Ann would not mind him. A conference had been arranged for June 6, 1959, at 8:30 a. m. On that occasion the witness talked privately with the defendant and with Julia Ann, and as a result it was decided that she should be removed from her parents' home and placed in a private home under the supervision of the juvenile court. On a number of occasions defendant had called the witness and inquired why the authorities had taken Julia Ann from his home and told the witness not to believe anything Julia Ann told him.

MRS. HARRY H. COFER—

This witness was the wife of defendant and mother of Julia Ann. Upon testifying that she had never seen any indecent acts between defendant and Julia Ann the state claimed "surprise" and declared her to be a "hostile" witness. Upon further questioning she denied having told juvenile court officials that she had observed her husband and Julia Ann indulging in indecent acts.

The following is a summary of defendant's evidence:

HARRY H. COFER (the defendant)—

He was forty-five years of age and lived in Lawrence with his wife and children. With respect to matters of discipline he had

been having trouble with Julia Ann for some time, principally over her "boy friends" and late hours. His parents lived at 1312 Ohio Street in Lawrence. On the morning in question he arose about 7:45. His son Jerry was to do yard work for a Mrs. Stephenson, a neighbor of his parents, on that day. He and Jerry drove to Mrs. Stephenson's house and he then stopped in at the home of his parents at 8:05 a. m. He remarked to them that "he had to get going because he had to take Julia Ann to court." From there he drove to his home, arriving there about 8:15 a. m. Julia Ann was not ready but in a few moments they left and drove to the courthouse, arriving there about 8:30. He and Julia Ann were interviewed separately by the probation officer. Following these conferences they went to a grocery store and then directly home. He vigorously denied any wrongdoing or indecent acts with Julia Ann, and denied that they had driven out west of Lawrence on the morning in question. He admitted that he had been strict with her because he wanted her to get an education, and that they had had trouble over the late hours she had been keeping when out with boys and over her poor grades in school. For some time he had been employed by the Western Auto Company in Lawrence, and he first learned that Julia Ann was accusing him on June 16, 1959, ten days after the alleged offenses.

JERRY COFER—

This witness, fourteen years of age, was the son of defendant and brother of Julia Ann, and he testified that on the morning in question defendant drove him to the home of Mrs. Stephenson, where he was to work that day. They left the house together a little before 7:30 a. m., and he personally saw defendant at defendant's parents' house, next door to Mrs. Stephenson, a few minutes later. Julia Ann got out of bed a few minutes before he and defendant left for the home of Mrs. Stephenson.

EVA MAY COFER—

This witness was the eleven-year-old daughter of defendant and a sister of Julia Ann. She and Julia Ann slept together, and on the morning in question Julia Ann left home a little after 8:00 o'clock with her father to keep the juvenile court appointment. Julia Ann had not written any letters that morning prior to the time she left home.

MRS. MARY G. STEPHENSON—

This witness was the lady for whom Jerry Cofer was to work on June 6th. She lived next door to defendant's parents. On that morning defendant brought Jerry to her house at 7:30, and after visiting for a few minutes defendant went next door to his parent's home where he stayed until at least 8:00 o'clock. She did not see Julia Ann at any time that morning.

HARRY C. COFER—

This witness was the father of defendant and grandfather of Julia Ann. He saw defendant and Jerry on June 6th about 7:30 a. m. Jerry had put on his working clothes at the house of witness. Defendant left the house of witness at approximately 8:05 that morning, mentioning that he had to take Julia Ann to the courthouse. Witness did not see Julia Ann that morning.

MRS. HARRY C. COFER—

This witness was the mother of defendant and grandmother of Julia Ann. Defendant and Jerry came to her home on the morning in question at approximately 7:30. Defendant stayed at her house until a few minutes after 8:00 o'clock, talking with her and her husband.

JULIA ANN COFER (the complaining witness)—

She was called as a witness by defendant and questioned concerning several letters she had written to certain "boy friends." She identified at least three of them as being in her handwriting. After considerable discussion concerning their relevancy the court refused their introduction in evidence.

MRS. MYRTLE DEBUTTS—

She was the wife of a minister in Lawrence and testified that the general reputation of Julia Ann for truth and veracity was "not too good." On cross-examination she admitted that her opinion in the matter was her own and not that of the community.

DR. RAY A. CLARK—

This witness was a physician-psychiatrist in Lawrence and whose qualifications were not questioned. He testified that he was acquainted with Julia Ann and the Cofer family and that he had a written authorization by defendant and his wife to testify as to matters concerning the family. Upon being asked concerning his

treatment of Julia Ann the state objected on the ground such testimony was privileged and that he was incompetent to testify under the provisions of G. S. 1949, 60-2805, *Sixth.* The objection was sustained and the witness was excused.

In rebuttal the state introduced the testimony of a deputy clerk of the probate court and of a secretary in the county attorney's office to the effect that defendant's wife had stated in their presence that she had seen defendant and Julia Ann engaged in sexual relations, and that at the time such statement was made she was crying and emotionally upset.

This completed the evidence in the case and, as heretofore stated, defendant was convicted of both charges.

Defendant filed a motion for a new trial alleging erroneous rulings and instructions by the court, the court's failure to fully instruct the jury and that the verdicts were wholly contrary to the law and the evidence.

Prior to the hearing on that motion defendant filed an additional motion for a new trial on the ground of newly-discovered evidence.

At the hearing on these motions defendant offered the affidavits of two women (one of whom was Mrs. Mary G. Stephenson, who testified at the trial) to the effect that they had visited with Julia Ann at the home where she had been placed, about two weeks after the trial, and that Julia Ann had then told them the testimony she had given at the trial was false. The state countered with the testimony of Paul Mohler (in whose home Julia Ann had been placed) to the effect the affidavits were false and that Julia Ann had made no such statement.

Also, at the hearing on the motions for a new trial, defendant offered in affidavit form (G. S. 1949, 60-3004) the testimony of Dr. Ray A. Clark which the court had excluded during the course of the trial. Omitting formal parts—the affidavit reads:

"This report of a psychological evaluation of Julia Ann Cofer is based on a recent interview and almost 10 years of contact with the Cofer family as their family physician.

"(1) Her father had been objecting sternly to her conduct. He emphatically opposed her marriage at age 16 and before she finished school. Shortly before she made the charges against her father, he had a violent reaction against her proposed marriage to Lloyd Whitson and threw some type of tantrum, for which I was consulted at 1 a. m. His opposition to her proposed marriage supplied a motive for desiring to get rid of her father. It is psychologically significant that he was not accused before this motive was present

and that the accusations were made very soon after her marriage was violently opposed.

"(2) In the County Attorney's office, Julia Ann lied to me. Early in her conversation she said that her father had never had any sex contacts with her at home, but had always taken her out in the car. She was insensed by the fact that her father had given her a bath over her protests at age 15 and dwelled considerably on the subject. Later in the conversation, however, she said that he 'did it to me 2 or 3 times a week since I was 9 years old.' On questioning where this was done, she said that he took her out in the car sometimes and did it at home sometimes.

"On questioning her about pain at that early age, she said, 'It made my sides hurt.' I then asked her if the sex act was exactly the same then as it was in recent years and she assured me that it was. This is a physical impossibility in a 9 year old girl of her development. Had such an act been forced and her screams not heard, she would certainly have been a bed patient with all types of evidence present to indicate what had happened.

"She also stated that her father had done absolutely nothing to protect her from pregnancy. It is certainly unlikely that a young healthy girl in early sexual maturity would be exposed to possible pregnancy two or three times a week indefinitely by one of known fertility without becoming pregnant. It is also inconceivable that a father, with proven protective instincts for his family, would offer no protection in such a case.

"Even the setting for the alleged act in the car near town in broad daylight at the busy time when parents are taking their children to school is not one for a 45 year old father and his little daughter.

"Julia Ann states that she never wanted to see her father or her grandparents again. Never once did she indicate that her hatred for her father was due to his alleged sex acts with her. Instead, she hated her father because he treated the rest of the children better than he did her, he whipped her for things the other children did, he forced her to do 'all the work around the house.' 'He would hit me and use his belt on me and make me go to school.'

"Certainly this statement violates two principles of psychology. In the first place, her contempt for her father would be due to the alleged sex acts had they really occurred and that should be major in her mental trauma. Instead, her mind is filled with other resentment to a point that the sex acts are forgotten.

"The other violation of expected human behavior is from her father. Instead of abusing her, one would expect her to receive special treatment, gifts, and favors if illicit sex relations existed between the two.

"She stated also that she never wanted to see her grandparents again because they had bawled her out for her conduct with Dale Myers. She said, 'Each time they called down, all I heard was a bawling out.'

"The same day of my interview with Julia Ann, the County Attorney told me that she had been given a lie detector test, which was unsatisfactory because she had become hysterical. Certainly this type of behavior indicates that she was afraid her deception would be revealed. To my knowledge, other types of examination and questioning were made voluntarily, gladly and in good spirits.

"*Diagnosis:* Psychoneurosis, anxiety type, manifested by numerous psychosomatic complaints, vomiting, back pains, and purposeful lies to relieve part of the emotional conflict."

In addition, defendant offered another detailed affidavit by Dr. Clark relating to the mental deficiency of defendant's wife and concerning his conclusion of her incompetency to give any type of reliable testimony in either a civil or criminal action. This affidavit will not be set out.

A new trial was denied, the verdicts were approved and sentence was pronounced under the applicable statutes.

In this court defendant raises several points—two of which we believe have merit and require that a new trial be granted.

The first concerns the letters written by Julia Ann to "boy friends," and which were excluded. On first blush they might be considered to be of doubtful relevancy and materiality. On the other hand, the nature of this case, the evidence showing the background of trouble between Julia Ann and defendant arising out of her relationships with boys, and the contents of the letters themselves, were such that we believe the letters should have been admitted and that it was prejudicial error to exclude them.

The second concerns the testimony of Dr. Clark which was excluded on the ground it was privileged under the provisions of G. S. 1949, 60-2805, which read:

"The following persons shall be incompetent to testify:

.    .    .    .    .    .    .    .    .    .    .    .    .

"*Sixth.* A physician or surgeon concerning any communications made to him by his patient with reference to any physical or supposed physical disease, defect, or injury, or the time, manner or circumstances under which the ailment was incurred, or concerning any knowledge obtained by a personal examination of any such patient, without the consent of the patient.

.    .    .    .    .    .    .    .    .    .    .    ."

The parties have cited no authorities closely in point and our limited research has disclosed none.

Generally speaking, it may be said the statute contemplates that the patient may consent to his physician testifying and therefore no question of public policy is involved. It is elementary that communications made in professional confidence are not incompetent, and that if a third person hears them he may testify. The disqualification is imposed upon the physician only, and not for his benefit or for the benefit of the public, but merely is a privilege to the patient, which privilege, like many others, may be waived. (*In-*

*surance Co. v. Brubaker*, 78 Kan. 146, 155, 96 Pac. 62, 130 Am. St. Rep. 356, 18 LNS 362; *Flack v. Brewster*, 107 Kan. 63, 65, 66, 67, 190 Pac. 616, and *Chaffee v. Kaufman*, 113 Kan. 254, 256, 214 Pac. 618.)

In 58 Am. Jur., Witnesses, it is said that statutes making communications between physician and patient privileged are intended to inspire confidence in the patient and encourage him in making a full disclosure to the physician as to his symptoms and condition by preventing physicians from making known to the curious the ailments of their patients, particularly when afflicted with diseases which might bring reproach, criticism, unfriendly comment or disgrace upon the patient if known to exist (§ 402, p. 233); that statutory provisions disqualifying physicians from testifying concerning communications made to them by their patients are generally construed not to apply to disclosures publicly and freely made in the presence of third persons (§ 404, p. 234); and that as a general rule such statutes do not include, as privileged, communications or knowledge as to family matters, affairs or relations incidentally made to or observed by a physician while professionally attending a patient (§ 421, p. 241).

Assuming, without deciding, that in a strictly technical sense a portion of Dr. Clark's testimony relating to Julia Ann was "privileged" to her, we are of the opinion that under the very peculiar and unusual circumstances of this case the privilege, if it ever existed, was for all practical purposes waived.

Dr. Hermes, in testifying for the state, told of his physical examination of Julia Ann and his conclusions drawn therefrom. He further stated she was so emotionally upset as to be in need of psychiatric treatment. This evidence parallels closely some of the psychological evaluations by Dr. Clark. It also appears that upon a number of occasions third parties (members of the family) were present, and, of course, the doctor was employed by her parents. If any so-called "privilege" existed with respect to Julia Ann—it belonged to her—and the record does not disclose she ever asserted or claimed it. Dr. Clark had a signed authorization by defendant and his wife to testify as to the Cofer family. Such being the case, both of them waived any privilege as applied to them, and Dr. Clark's testimony as to defendant's wife's mental deficiency was also admissible. Under all of the facts and circumstances of the case we believe that the testimony of Dr. Clark concerning Julia

Ann and the Cofer family was admissible and that its exclusion resulted in prejudice to defendant to the extent that a new trial should be granted.

Other matters are raised in the briefs but in view of our conclusion need not be discussed.

The judgment is therefore reversed with directions to grant a new trial.